PEOPLE v FREDERICK

PEOPLE v VAN DOORNE

Docket Nos. 323642 and 323643. Submitted August 4, 2015, at Grand
    Rapids. Decided December 8, 2015, at 9:00 a.m. Leave to appeal
    sought.

Defendants Michael Christopher Frederick and Todd Randolph Van
    Doorne were each charged in the Kent Circuit Court with various
    controlled substance offenses arising after members of the Kent
    Area Narcotics Enforcement Team (KANET) recovered mari-
    juana butter during early-morning searches of each defendant's
    home. Before searching defendants' homes, KANET officers had
    executed a search warrant at Timothy Scherzer's home and
    received information that defendants possessed marijuana but-
    ter. KANET learned that Scherzer provided a large amount of
    marijuana butter to a corrections officer named Timothy Bern-
    hardt, and Bernhardt delivered an unknown quantity of the
    marijuana butter to each defendant. Both defendants possessed
    medical marijuana cards and both identified Scherzer as their
    caregiver. KANET officers decided against obtaining search war-
    rants for defendants' homes. Instead, seven KANET officers went
    to Frederick's home at approximately 4:00 a.m. and knocked on
    his door. Frederick answered the door shortly after the officers
    knocked and invited the officers into his home. The officers asked
    if they could see his marijuana butter, and Frederick agreed.
    Frederick signed a form giving KANET officers permission to
    search his home, the officers informed Frederick of his *Miranda*
    rights, and Frederick signed a card waiving those rights. Then, at
    approximately 5:30 a.m., KANET officers went to Van Doorne's
    home, where the officers similarly engaged Van Doorne in con-
    versation, and Van Doorne invited the officers in so he could
    retrieve his medical marijuana card. Van Doorne and the officers
    ultimately spoke outside in a van because Van Doorne's dog would
    not stop barking. Van Doorne also signed forms waiving his
    *Miranda* rights and consenting to a search of his home. Each
    defendant filed a motion to suppress the evidence found during
    the search of his home, arguing that his consent to search was
    involuntary,     and     that     the     knock-and-talk     procedure

conducted at his home violated the Fourth Amendment according to the United States Supreme Court's decision in *Florida v Jardines*, 569 US ___ (2013). After an extensive evidentiary hearing, the trial court, Dennis B. Leiber, J., denied both motions. The court concluded that each defendant voluntarily consented to the search of his home, and that the knock-and-talk procedure used at each defendant's home did not offend the Fourth Amendment. Frederick and Van Doorne filed separate applications for leave to appeal, which were denied. Defendants appealed in the Supreme Court, which ordered that the cases be remanded to the Court of Appeals for consideration as on leave granted. 497 Mich 933 (2015). The Court of Appeals consolidated the cases.

The Court of Appeals *held*:

1. The knock-and-talk procedures used in these consolidated cases were not "searches" as contemplated by the Fourth Amendment, or as "search" is defined in *Jardines*. Therefore, unlike the outcome in *Jardines*, the evidence recovered at each defendant's home was admissible against each defendant at trial. The officers' intent in these cases and in *Jardines* determined whether the officers conducted a permissible, and thus, a constitutional, knock-and-talk. In *Jardines*, two police officers approached on foot a home suspected of housing a marijuana-grow operation. The officers were accompanied by a drug-sniffing dog, and the dog alerted at the home's front door. Because the officers obtained information by an unlawful physical intrusion on the defendant's property, a "search" within the meaning of the Fourth Amendment occurred. In *Jardines*, the officers' intent was solely to search for information, not to speak with the home's occupants, whereas the officers in the cases at bar intended to speak with Frederick and Van Doorne. That the officers also anticipated discovering and seizing marijuana butter does not establish a violation of the Fourth Amendment as long as the officers operated with the intent to speak to Frederick and Van Doorne. Even though the officers in these cases intended to ask for consent to search defendants' homes, and even though the officers expected to find inculpatory evidence at the homes, their purpose was not solely to gather evidence or information without first obtaining a warrant.

2. Members of the general public have an implied license to approach a home's entrance—generally, the front door—by the front path, knock, wait briefly, and unless an express invitation to linger is extended, leave the property. Police officers have the

same implicit license. They may approach a home and knock because that is "no more than any private citizen might do." When the police comply with the scope of the implied license, no "search" has occurred. However, the implied license is not an invitation to bring a drug-sniffing dog within the protected area of a person's home in an effort to discover evidence of a controlled substance offense. The police officers in *Jardines* exceeded the scope of the implied license. Their presence at the defendant's front door—with a drug-sniffing dog—transformed what was otherwise a lawful entry onto the defendant's property into an unlawful, warrantless search that violated the defendant's Fourth Amendment protections.

3. *Jardines* established the line between permissible and impermissible knock-and-talks. The line is defined by a police officer's intent at the time he or she approaches a home. An officer who has no intention of speaking to the occupant of the home but is only at the home to gather evidence, has crossed the line and engages in an unconstitutional search. An officer who intends to speak with the occupant of the home, even if the officer intends to seek permission to search the home, acts within the scope of the implied license—that is, an officer who intends to speak to the occupant has not crossed the line.

Affirmed.

SERVITTO, J., dissenting, concluded that the knock-and-talks that occurred in these cases violated Frederick's and Van Doorne's Fourth Amendment rights and would have reversed the trial court and remanded the cases to the trial court for entry of an order suppressing the evidence against each defendant. All the circumstances involved in the knock-and-talks at Frederick's and Van Doorne's homes constituted police conduct that offended the Fourth Amendment. Those circumstances include the time of night KANET officers conducted the knock-and-talks, an objective view of the officers' conduct, the number of officers present at the time, and the officers' failure to advance any objectively reasonable explanation why the interactions with defendants could not have occurred in the daytime or why the officers did not obtain a search warrant. The instant case presented an opportunity to address possible constitutional limitations on the knock-and-talk procedure. That is, does a knock-and-talk conducted at a private residence in the middle of the night without evidence that the occupant of the residence extended an explicit or implicit invitation to strangers to visit during those hours constitute an unconstitutional search in violation of the Fourth Amendment? Other jurisdictions have

answered the question, noting that (1) the time of day at which a knock-and-talk is initiated is a significant factor in determining whether the knock-and-talk is really an unreasonable search and (2) the officers' purpose in approaching a person's home is also a significant factor in making that determination. While the time of a knock-and-talk is not the only deciding factor in determining whether an unconstitutional search occurred, it is, along with the totality of circumstances surrounding the knock-and-talk, at least a significant factor to consider.

1. CONSTITUTIONAL LAW — FOURTH AMENDMENT — SEARCHES AND SEIZURES — KNOCK-AND-TALK.

A police officer's intent distinguishes between permissible and impermissible knock-and-talks; a police officer who approaches a person's house with the belief that a controlled substance will be found in the home does not violate the Fourth Amendment of the United States Constitution as long as the officer intended to speak with the occupant of the home and was not there solely for the purpose of gathering evidence or information without a warrant; an officer who knocks on the door to a person's house with no intention of speaking to the person but solely with the intention of collecting information and evidence, violates the Fourth Amendment's prohibition against unreasonable searches and seizures; provided that a police officer intends to speak with the occupant of a house, an officer may approach a house with the intention of asking the occupant for consent to search the house and with the expectation that contraband will be found during the search.

2. CONSTITUTIONAL LAW — FOURTH AMENDMENT — HOUSES — IMPLIED LICENSE TO APPROACH.

Police officers, like members of the general public, have an implied license to approach a home's entrance using the front path, knock on the door, wait briefly, and if not received or expressly invited to linger there, leave the property; as long as a police officer acts within the scope of the implied license, there is no Fourth Amendment violation.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *William A. Forsyth*, Prosecuting Attorney, and *James K. Benison*, Chief Appellate Attorney, for the people.

*Shaw Law Group, PLC* (by *Jeffrey P. Arnson*), for Michael Christopher Frederick.

*Bruce Alan Block, PLC* (by *Bruce Alan Block* and *Bogomir Rajsic III*), for Todd Randolph Van Doorne.

Before: TALBOT, C.J., and K. F. KELLY and SERVITTO, JJ.

TALBOT, C. J. These consolidated cases are before us on remand from our Supreme Court.[1] On remand, our Supreme Court has directed us to consider "whether the 'knock and talk' procedure[s] conducted in th[ese] case[s are] consistent with US Const, Am IV, as articulated in *Florida v Jardines*, [569 US ___;] 133 S Ct 1409[; 185 L Ed 2d 495] (2013)." For the reasons discussed, we conclude that the knock-and-talk procedures conducted with respect to both Frederick and Van Doorne were consistent with the Fourth Amendment. Accordingly, we affirm the trial court's decision.

I. FACTS

On March 17, 2014, at approximately 10:15 p.m., the Kent Area Narcotics Enforcement Team (KANET) executed a search warrant at the home of Timothy and Alyssa Scherzer. While executing this warrant, the KANET officers learned that the Scherzers, acting as caregivers, had been providing marijuana butter to corrections officers employed by the Kent County Sheriff Department (KCSD). Scherzer informed the KANET officers that he had given 14 pounds of marijuana butter to one corrections officer, Timothy Bernhardt, who acted as a middleman and distributed the

---

[1] *People v Frederick*, 497 Mich 993 (2015); *People v Van Doorne*, 497 Mich 993 (2015).

butter to other corrections officers. Frederick and Van Doorne were identified as two corrections officers who received marijuana butter through Bernhardt. Both had been issued medical marijuana cards, and both identified Timothy Scherzer as their caregiver.

Based on this information, the KANET officers contemplated whether to obtain search warrants for the homes of the additional suspects, or alternatively, to simply go to the home of each suspect, knock, and request consent to conduct a search. The officers chose the latter approach. The team, composed that night of seven officers,[2] conducted four knock-and-talks in the early morning hours of March 18, 2014. The officers first visited Bernhardt and another corrections officer.[3] At approximately 4:00 a.m., the officers, in four unmarked vehicles, arrived at Frederick's home. Each officer was wearing a tactical vest, and each had a handgun holstered at his or her hip. Four officers approached the front door, knocked, and waited. Within a few minutes, Frederick answered the door and spoke to the officers. The officers informed Frederick that his name had come up in a criminal investigation and asked if they could come inside and speak with him. Frederick invited the officers inside. The officers asked if they could see Frederick's marijuana butter, and he agreed. Frederick signed a form granting his consent to conduct a search. The officers also informed Frederick of his *Miranda*[4] rights, and Frederick signed a card waiving those rights. Officers recovered marijuana butter from Frederick's home.

---

[2] A total of eight officers are members of KANET. However, one officer was unavailable on the night of March 17, 2014.

[3] Neither Bernhardt nor this other officer is a party to the instant appeal.

[4] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

The team arrived at the home of Van Doorne at approximately 5:30 a.m. Because ice made the front door inaccessible, four officers knocked at a side door. Van Doorne awoke and looked outside. Recognizing some of the officers standing outside his home, Van Doorne opened the door and spoke with them. As they had with Frederick, the officers explained the purpose of their visit. Van Doorne, believing that the issue could be resolved by showing the officers his medical marijuana card, invited the officers inside. However, because his dog continued to bark, Van Doorne and the officers decided to speak outside in a van. Once inside the van, Van Doorne signed forms waiving his *Miranda* rights and consenting to a search of his home. Officers recovered marijuana butter from Van Doorne's home.

Frederick and Van Doorne were charged with various controlled substance offenses.[5] Both men filed motions to suppress the evidence obtained during the searches. Each made two arguments: (1) his consent to the search was involuntary, and (2) the knock-and-talk procedure violated the Fourth Amendment under *Jardines*. After an extensive evidentiary hearing, the trial court denied the motions, concluding that the knock-and-talk procedures were not searches or seizures under the Fourth Amendment, and that both men voluntarily consented to the searches. Frederick and Van Doorne filed separate applications for leave to appeal in this Court, which this Court denied.[6] In lieu of granting leave to appeal, our Supreme Court re-

[5] Frederick and Van Doorne were also placed on unpaid leave from their positions with the corrections department.

[6] *People v Frederick*, unpublished order of the Court of Appeals, issued October 15, 2014 (Docket No. 323642); *People v Van Doorne,* unpublished order of the Court of Appeals, issued October 15, 2014 (Docket No. 323643).

manded both cases to this Court to determine whether the knock-and-talk procedures were constitutional in light of *Jardines*.[7]

## II. DISCUSSION

### A. STANDARD OF REVIEW

"We review for clear error a trial court's findings of fact in a suppression hearing, but we review de novo its ultimate decision on a motion to suppress."[8] Whether a violation of the Fourth Amendment has occurred is an issue of constitutional law which we review de novo.[9]

### B. THE SCOPE OF OUR INQUIRY

We first address the limited scope of our review of the cases before us. The Fourth Amendment of the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."[10] Under the plain language of the amendment, "[t]he Fourth Amendment is not a guarantee against all searches and seizures, but only against those that are unreasonable."[11] Thus, in any given Fourth Amendment case, there are two general inquiries to be made: (1) whether a "search or seizure" of a person, area, or object protected by the

---

[7] *Frederick*, 497 Mich 993; *Van Doorne*, 497 Mich 993.

[8] *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009).

[9] *Id.*

[10] US Const, Am IV.

[11] *People v Shabaz*, 424 Mich 42, 52; 378 NW2d 451 (1985). See also *People v Dagwan*, 269 Mich App 338, 342; 711 NW2d 386 (2005) (under the Fourth Amendment, "not all searches are constitutionally prohibited, only unreasonable searches").

amendment occurred, and (2) if so, whether that search or seizure was unreasonable.

In this case, however, our inquiry is limited to the question whether the knock-and-talk procedures used in these cases amounted to a "search" within the meaning of the Fourth Amendment. To understand the scope of our inquiry, we reiterate that our Supreme Court has directed us to consider only whether the knock-and-talk procedures conducted in these cases were consistent with the Fourth Amendment as articulated in *Jardines*. In *Jardines*, the United States Supreme Court's inquiry was "limited to the question of whether the officers' behavior was a search within the meaning of the Fourth Amendment."[12] The Court did not address whether, assuming a search occurred, the search was reasonable, nor did it address whether a seizure had occurred. Thus, we read our Supreme Court's order as directing us to consider a limited question: whether the knock-and-talk procedures used in these consolidated cases were "searches" within the meaning of the Fourth Amendment, as a "search" is defined by *Jardines*.[13] We answer this question in the negative.

### C. *FLORIDA v JARDINES*

The starting point of our analysis is the United States Supreme Court's opinion in *Florida v Jardines*. In *Jardines*, two police officers, acting on a tip that a

---

[12] *Jardines*, 569 US at ___; 133 S Ct at 1414.

[13] Thus, we do not address whether the trial court erred with respect to Frederick's and Van Doorne's contentions that they did not voluntarily consent to the searches of their homes. Nor do we address whether the knock-and-talk procedures became "seizures" under the Fourth Amendment, another argument rejected by the trial court. Such inquiries are outside the limited scope of our review on remand.

home was being used to grow marijuana, approached the home on foot.[14] The officers were accompanied by a dog trained to detect the odor of specific controlled substances.[15] The dog detected the odor of one of these substances and alerted at the base of the home's front door.[16] The officers then used this information to obtain a warrant to search the home.[17] Writing for the majority, Justice Scalia used a property-rights framework to determine whether the officers had conducted a search by approaching the home with the drug-sniffing dog.[18]

First, Justice Scalia explained that "[w]hen 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.' "[19] Justice Scalia explained

---

[14] *Jardines*, 569 US at ___; 133 S Ct at 1413.

[15] *Id.* at ___; 133 S Ct at 1413.

[16] *Id.* at ___; 133 S Ct at 1413.

[17] *Id.* at ___; 133 S Ct 1413. When the warrant was executed, the officers found marijuana plants, resulting in charges of marijuana trafficking against Jardines. *Id.* at ___; 133 S Ct 1413.

[18] In a concurrence joined by two other justices, Justice Kagan explained that she "could just as happily have decided [the case] by looking to Jardines' privacy interests." *Id.* at ___; 133 S Ct at 1418 (Kagan, J., concurring). Using a privacy-interests framework, Justice Kagan would have simply held that because the officers used a " 'device . . . not in general public use' "—the drug-sniffing dog—"to explore details of the home' . . . that they would not otherwise have discovered without entering the premises," a search occurred. *Id.* at ___; 133 S Ct at 1419, quoting *Kyllo v United States*, 533 US 27, 40; 121 S Ct 2038; 150 L Ed 2d 94 (2001) (Kagan, J., concurring). Justice Scalia found it unnecessary to consider Jardines's privacy interests. Justice Scalia explained that the property-rights framework was the Fourth Amendment's baseline, and that the privacy-interests framework merely added to that baseline. *Id.* at ___; 133 S Ct at 1417. Having concluded that a search occurred under the property-rights framework, Justice Scalia found it unnecessary to consider whether the same conclusion would be reached under a privacy-interests framework. *Id.* at ___; 133 S Ct at 1417.

[19] *Id.* at ___; 133 S Ct at 1414, quoting *United States v Jones*, 565 US ___, ___ n 3; 132 S Ct 945, 950-951 n 3; 181 L Ed 2d 911 (2012).

that a home's front porch was a "classic exemplar of an area adjacent to the home," commonly known as the "curtilage," which is considered part of a home and, thus, is protected by the Fourth Amendment.[20] Because "the officers' investigation took place in a constitutionally protected area," the question became "whether it was accomplished through an unlicensed physical intrusion."[21] To answer this question, Justice Scalia inquired into whether Jardines "had given his leave (even implicitly) for" the officers to set foot on his property.[22] Justice Scalia then explained:

> "A license may be implied from the habits of the country," notwithstanding the "strict rule of the English common law as to entry upon a close." *McKee* v. *Gratz*, 260 U. S. 127, 136 [43 S Ct 16; 67 L Ed 167] (1922) (Holmes, J.). We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." *Breard* v. *Alexandria*, 341 U. S. 622, 626 [71 S Ct 920; 95 L Ed 1233] (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters. Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." *Kentucky* v. *King*, 563 U. S. [452, 469; 131 S Ct 1849; 179 L Ed 2d 865 (2011)].[23]

---

[20] *Jardines*, 569 US at ___; 133 S Ct at 1414-1415.

[21] *Id*. at ___; 133 S Ct at 1415.

[22] *Id* at ___; 133 S Ct at 1415.

[23] *Id*. at ___; 133 S Ct at 1415-1416.

In *Jardines*, the majority concluded that the officers exceeded the scope of this implied license and, thus, conducted a search within the meaning of the Fourth Amendment. This was because while any ordinary citizen might walk up to the front door of a home and knock, an ordinary citizen would not do so while conducting a search of the premises using a specially trained, drug-sniffing dog.[24] As explained by Justice Scalia, "[t]he scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose. . . . [T]he background social norms that invite a visitor to the front door do not invite him there to conduct a search."[25] Thus, Justice Scalia concluded that "[t]he government's use of trained police dogs to investigate the home and its immediate surroundings is a 'search' within the meaning of the Fourth Amendment."[26]

### D. *JARDINES* APPLIED

Justice Scalia's implied-license framework has since been used by many courts to analyze the constitutional validity of a knock-and-talk procedure.[27] Using this framework, we conclude that the knock-and-talks conducted in these cases were not "searches" within the meaning of the Fourth Amendment. We begin with the observation that, as *Jardines* makes clear, an ordinary knock-and-talk is well within the scope of the license

---

[24] *Id.* at ___; 133 S Ct at 1416 ("But introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that.*").

[25] *Id.* at ___; 133 S Ct at 1416.

[26] *Id.* at ___; 133 S Ct at 1417-1418.

[27] See, e.g., *United States v Walker*, 799 F3d 1361, 1362-1363 (CA 11, 2015); *Covey v Assessor of Ohio Co*, 777 F3d 186, 192-193 (CA 4, 2015); *United States v Lundin*, 47 F Supp 3d 1003, 1010-1011 (ND Cal, 2014); *JK v State*, 8 NE3d 222, 231-236 (Ind App, 2014).

that may be " 'implied from the habits of the country[]' . . . ."[28] In general terms, *Jardines* explains that there exists "an implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave."[29] And generally speaking, that is exactly what occurred in both cases now before us. In each instance, officers approached the home, knocked, and waited to be received. And in each instance, the officers were received by the homeowners. *Jardines* plainly condones such conduct.[30] Indeed, even "Jardines conceded . . . the unsurprising proposition that the officers could have lawfully approached his home to knock on the front door in hopes of speaking with him."[31]

In order to find a Fourth Amendment violation, then, there must be circumstances present that would transform what was otherwise a lawful entrance onto private property into an unlawful, warrantless search. In *Jardines*, such circumstances existed because when the officers set foot on a protected area, they were accompanied by a drug-sniffing dog.[32] Frederick and Van Doorne argue that the time of the knock-and-talks, and the manner in which the officers approached, compel a conclusion that each knock-and-talk was a

---

[28] *Jardines*, 569 US at ___; 133 S Ct at 1415, quoting *McKee*, 260 US at 136 (Holmes, J.).

[29] *Jardines*, 569 US at ___; 133 S Ct at 1415.

[30] *Id* at ___; 133 S Ct at 1415.

[31] *Id.* at ___; 133 S Ct at 1415 n 1.

[32] *Id.* at ___; 133 S Ct at 1415-1416 (recognizing that the police may enter private property to conduct a knock-and-talk, "[b]ut introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do *that*."). See also *id.* at ___; 133 S Ct at 1416 n 4 ("[N]o one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

search under the Fourth Amendment.[33] For the reasons discussed, we disagree.

### 1. THE OFFICERS' PURPOSE

Frederick and Van Doorne argue that based on an objective view of the manner in which the officers conducted the knock-and-talks, the KANET officers' purpose in conducting the knock-and-talks exceeded the scope of the implied license discussed in *Jardines*. Frederick and Van Doorne argue that the officers did not intend to speak with them, but rather, intended to conduct a search. We disagree.

First, we clarify that even post-*Jardines*, an officer may conduct a knock-and-talk with the intent to gain the occupant's consent to a search or to otherwise acquire information from the occupant. That an officer intends to obtain information from the occupant does not transform a knock-and-talk into an unconstitutional search. Before *Jardines*, this Court held that the knock-and-talk procedure was constitutional.[34] Our Court explained that one entirely acceptable purpose of a knock-and-talk is to do exactly what the officers did in these cases—obtain an occupant's consent to conduct a search:

> Generally, the knock and talk procedure is a law enforcement tactic in which the police, who possess some

---

[33] Relying on Justice Scalia's description of the knock-and-talk procedure in *Jardines*, Frederick and Van Doorne ask us to adopt a three-part test to evaluate these consolidated cases. Under this proposed test, officers would be required to (1) approach a home by the front path, (2) with only the intent to speak with the occupants of the home (and not to conduct a search), and (3) knock promptly, wait briefly, and absent an invitation from the occupant to remain, leave the premises. We find it unnecessary to adopt such a test to decide the matters before us, and thus, we decline to adopt this proposed test.

[34] *People v Frohriep*, 247 Mich App 692; 637 NW2d 562 (2001).

information that they believe warrants further investigation, but that is insufficient to constitute probable cause for a search warrant, approach the person suspected of engaging in illegal activity at the person's residence (even knock on the front door), identify themselves as police officers, *and request consent to search for the suspected illegality or illicit items.* . . .

We decline defendant's request to hold that the knock and talk procedure is unconstitutional because defendant points to no binding precedent, nor have we found any, prohibiting the police from going to a residence and engaging in a conversation with a person. We conclude that in the context of knock and talk the mere fact that the officers initiated contact with a citizen does not implicate constitutional protections. It is unreasonable to think that simply because one is at home that they are free from having the police come to their house and initiate a conversation. *The fact that the motive for the contact is an attempt to secure permission to conduct a search does not change that reasoning.* We find nothing within a constitutional framework that would preclude the police from setting the process in motion by initiating contact and, consequently, we hold that the knock and talk tactic employed by the police in this case is constitutional.[35]

*Jardines* does not hold to the contrary. In his dissenting opinion in *Jardines*, Justice Alito wrote:

As the majority acknowledges, this implied license to approach the front door extends to the police. See *ante*, at

---

[35] *Id.* at 697-698 (citations omitted; emphasis added). See also *People v Galloway*, 259 Mich App 634, 640; 675 NW2d 883 (2003) ("Knock and talk, as accepted by this Court in *Frohriep*, does not implicate constitutional protections against search and seizure because it uses an ordinary citizen contact as a springboard to a consent search."). Federal courts have reached the same conclusion. *Ewolski v City of Brunswick*, 287 F3d 492, 504-505 (CA 6, 2002) (" 'Federal courts have recognized the "knock and talk" strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity.' "), quoting *United States v Jones*, 239 F3d 716, 720 (CA 5, 2001).

[569 US at ___; 133 S Ct at 1415]. As we recognized in *Kentucky* v. *King*, 563 U. S. [452; 131 S Ct 1849; 179 L Ed 2d 865 (2011)], police officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a "knock and talk," *i.e.*, knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence. . . . Even when the objective of a "knock and talk" is to obtain evidence that will lead to the homeowner's arrest and prosecution, the license to approach still applies. In other words, gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach. . . .

*       *       *

The Court concludes that Detective Bartelt went too far because he had the *"objectiv[e] . . . purpose* to conduct a search." *Ante*, at [569 US at ___; 133 S Ct at 1417] (emphasis added). What this means, I take it, is that anyone aware of what Detective Bartelt did would infer that his subjective purpose was to gather evidence. But if this is the Court's point, then a standard "knock and talk" and most other police visits would likewise constitute searches. With the exception of visits to serve warrants or civil process, police almost always approach homes with a purpose of discovering information. That is certainly the objective of a "knock and talk." The Court offers no meaningful way of distinguishing the "objective purpose" of a "knock and talk" from the "objective purpose" of Detective Bartelt's conduct here.[36]

In response to Justice Alito's critique, Justice Scalia explained:

The dissent argues, citing *King*, that "gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach." *Post*, at [569 US at ___; 133 S Ct at 1423]. That is a false generalization. What *King* establishes is that it is not a Fourth Amendment search to approach the home in order

---

[36] *Jardines*, 569 US at ___; 133 S Ct at 1423-1424 (Alito, J., dissenting) (third alteration in original).

to speak with the occupant, *because all are invited to do that.* The mere "purpose of discovering information," *post,* at [569 US at ___; 133 S Ct at 1424], in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment. But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.[37]

We read Justice Scalia's response to the dissent as drawing a line. The police do not violate the Fourth Amendment by approaching a home and seeking to speak with its occupant. Even if the police fully intend to acquire information or evidence as a result of this conversation, the line has not been crossed.[38] However, if the police enter a protected area not intending to speak with the occupant, but rather, solely to conduct a search, the line has been crossed.[39] In that sense, the knock-and-talk procedure cannot be used by the police as a smokescreen. Yet even post-*Jardines*, officers may still approach a home, knock, and if an occupant answers, speak to that occupant. The officers may then ask the occupant for information or for consent to conduct a search.[40]

Several cases help demonstrate when the police have crossed the line from a permissible knock-and-talk to an unconstitutional search or seizure. *Jardines*

---

[37] *Id.* at ___ n 4; 133 S Ct at 1416 n 4 (opinion of the Court).

[38] *Id.* at ___ n 4; 133 S Ct at 1416 n 4 ("The mere purpose of discovering information . . . in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment.") (quotation marks omitted).

[39] *Id.* at ___ n 4; 133 S Ct at 1416 n 4 ("But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.").

[40] *Id.* at ___ n 4; 133 S Ct at 1416 n 4. See also *United States v Perea-Rey*, 680 F3d 1179, 1187-1188 (CA 9, 2012) ("[I]t remains permissible for officers to approach a home to contact the inhabitants. The constitutionality of such entries into the curtilage hinges on whether the officer's actions are consistent with an attempt to initiate consensual contact with the occupants of the home.").

is one such example. As discussed, the officers in
*Jardines* exceeded the scope of the license because they
never attempted to speak with anyone, and instead,
approached the home while conducting a warrantless
search using a drug-sniffing dog. *United States v
Ferguson*,[41] a case cited by Frederick and Van Doorne,
is another such example. In *Ferguson*, two police
detectives traveled to a home to investigate a com-
plaint of an illegal marijuana grow operation.[42] The
detectives had not obtained a search warrant for the
residence.[43] As soon as the detectives left their vehicle,
"they could smell fresh marijuana and observed sur-
veillance cameras on the garage adjacent to the resi-
dence."[44] The defendants appeared, and the detectives
introduced themselves.[45] After the defendants claimed
to be operating an authorized medical marijuana op-
eration, one detective asked to see the required paper-
work.[46] Without asking for consent to search, the other
detective asked one defendant "how many marijuana
plants he had in the garage . . . ."[47] The detectives then
spent the next hour walking around the premises with
the defendants, investigating buildings and a recre-
ational vehicle.[48] At the end of this process, the detec-
tives presented the defendants with a written consent-
to-search form, which the defendants signed.[49]

The defendants filed a motion to suppress the evi-
dence viewed by the detectives, arguing that the detec-

---

[41] *United States v Ferguson*, 43 F Supp 3d 787 (WD Mich, 2014).

[42] *Id.* at 789.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] *Id.*

[47] *Id.* at 790.

[48] *Id.*

[49] *Id.*

tives had conducted a warrantless search of their home, and that the later-signed consent form did not remedy this constitutional violation.[50] The prosecutor argued, in part, that what transpired in the hour before the detectives obtained the defendants' written consent "qualified as a permissible 'knock and talk,' claiming that the detectives were 'not searching anything' during that first hour."[51] The trial court rejected the argument. Comparing the case to *Jardines*, the trial court concluded that by spending an hour investigating the premises, the detectives' conduct "objectively reveal[ed] a purpose to conduct a search . . . ."[52] This was because during the hour in which the detectives were ostensibly conducting a knock-and-talk, they were unquestionably obtaining information while in areas protected by the Fourth Amendment.[53]

One federal district court has similarly concluded that the police violate the Fourth Amendment by entering private property with the sole intent to conduct a warrantless arrest of the homeowner. In *United States v Lundin*, another case relied on by Frederick and Van Doorne, officers sought to arrest a suspected kidnapper, but had not obtained a warrant for his arrest.[54] At approximately 4:00 a.m., officers approached the front door of Lundin's home.[55] The officers knocked, and heard a series of crashes from the rear of

[50] *Id.* at 792.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 792-793. The trial court also concluded that the hour-long search was not conducted with either the express or implied consent of the defendants. *Id.* at 793-794.

[54] *Lundin*, 47 F Supp 3d at 1008.

[55] *Id.*

the home.[56] The officers identified themselves and ordered Lundin to put his hands in the air and slowly leave the home.[57] Lundin exited the backyard of the home and was taken into custody.[58]

In finding a Fourth Amendment violation, the district court relied on *Jardines* for the rule that "the officers' purpose, as revealed by an objective examination of their behavior, is clearly at least an important factor" when evaluating whether the officers exceeded the scope of the implied license.[59] The court explained that

> the behavior of the officers here objectively reveals a purpose to locate [Lundin] so that the officers could arrest him. Deputy Aponte had put out a request that Lundin be arrested; he believed that the officers already had probable cause for such an arrest; and the officers who arrived at the home were responding to Deputy Aponte's BOLO ["be on the lookout"].[60]

The court explained that "[u]nder the circumstances of this case, it is very difficult to imagine why the officers would have been seeking to initiate a consensual conversation with Lundin to ask him questions at four o'clock in the morning."[61] Thus, "[j]ust as the officers' clear purpose in *Jardines*—to search the curtilage for evidence—could not be pursued without a warrant, so too was the officers' clear purpose in this case—to arrest a suspect within his home—a goal whose attainment requires a warrant."[62]

The common thread in *Jardines*, *Ferguson*, and *Lundin* is that in each case, the officers' conduct revealed

---

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] *Id.* at 1012.

[60] *Id.*

[61] *Id.*

[62] *Id.* at 1012-1013.

that their intentions went far beyond conducting the type of consensual encounter that constitutes a knock-and-talk. In *Jardines*, the officers searched for evidence without ever speaking to the occupants of the home; in *Ferguson*, the detectives conducted an hour-long investigation of the property before requesting consent to do so; and in *Lundin*, the officers had no reason to set foot on the property other than to arrest its occupant. Thus, in each case, the officers crossed the line, exceeding the scope of the implied license discussed in *Jardines*. But here, the circumstances are far different. After discovering that contraband likely existed in the homes belonging to Frederick and Van Doorne, the officers made a conscious decision to ask each individual for consent to conduct a search rather than obtain a warrant. The officers went to each house, knocked, and made such a request. During the knock-and-talks, the officers did not attempt to conduct a search, as occurred in *Jardines* and *Ferguson*; they waited until obtaining the affirmative consent of each suspect. And unlike the circumstances in *Lundin*, the officers clearly had a legitimate reason to initiate a conversation with both Frederick and Van Doorne.

Frederick and Van Doorne argue that because seven armed officers "in full tactical gear" approached each house in the early morning hours to conduct the knock-and-talks, this Court should conclude that the "officers did not come to talk, but rather, came to search the home for marijuana butter they knew was present, and they were not going to leave until they had accomplished their goal[.]" The record reveals no such intention of the officers. First, it is true that seven officers went to each location. These seven officers represented all but one member of KANET, the absent member being unavailable that night. Further, only four of the

seven officers approached the homes to conduct the knock-and-talks. The record does not demonstrate that the officers used their numerosity to demand entrance or to overcome the will of Frederick or Van Doorne. Rather, the fact that seven officers traveled to each home demonstrates no more than that the entire team, working together on the investigation, traveled together as the investigation continued into the early morning hours.

Contrary to the assertions made by Frederick and Van Doorne, the KANET officers were not wearing "full tactical gear." Rather, the extent of the "tactical gear" worn by the officers were vests which bore the officers' badges and, in some cases, the KANET symbol.[63] That the officers wore these vests conveyed a message similar to the message conveyed by the uniform traditionally worn by an ordinary officer. In the same vein, it is also true that the officers were armed, but only in that each had a handgun holstered at the hip—again, the same as any ordinary police officer. These facts do not convey a purpose to do anything other than speak with the occupants of the homes.

The time of the visits does not demonstrate that the officers intended to conduct a warrantless search without first speaking to, and obtaining the consent of, Frederick and Van Doorne. The officers explained that they proceeded at this time of day because they had only learned that Frederick and Van Doorne were recipients of marijuana butter through a search conducted a few hours before the knock-and-talks. They feared that if they did not act quickly, Frederick and Van Doorne might be informed of the investigation and

---

[63] Specifically, one officer testified that the vests were "[b]lack nylon with [a] 'Sheriff' logo on one side, [a] badge on the other side and our KANET patch."

destroy evidence. Nothing in the record indicates that the officers chose to proceed at this time of day in order to frighten or intimidate either man, or otherwise use the time of day to gain an advantage. That the officers proceeded in the early morning hours does not demonstrate that the officers intended to conduct a search without first obtaining consent.

Rather, the officers' intent is most clearly demonstrated by their conduct at each home. As in any ordinary knock-and-talk, the officers approached each home, knocked, and waited for a response. When Frederick and Van Doorne responded, the officers explained the purpose of their visits. Both men were informed of their *Miranda* rights and asked to voluntarily consent to a search. The officers made no attempt to search for evidence until obtaining consent to do so. That the officers proceeded in this manner clearly demonstrates that it was their intent to speak with each individual and obtain his consent before proceeding any further. Frederick's and Van Doorne's contention that the officers would have conducted a warrantless search with or without their consent is purely speculation.[64] Thus, we conclude that the officers' purpose did not exceed the scope of the implied license as articulated in *Jardines*.

## 2. THE TIME OF THE VISITS

Frederick and Van Doorne next argue that the time of the visits exceeded the scope of the implied license to

---

[64] Rather, from the record before us, it appears equally likely (if not more so) that had Frederick and Van Doorne failed to respond, the officers would have retreated to their vehicles and considered other options. See *Perea-Rey*, 680 F3d at 1188 ("[O]nce an attempt to initiate a consensual encounter with the occupants of a home fails, the officers should end the knock and talk and change their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance.") (quotation marks and citation omitted). However, because both Frederick and Van Doorne responded, there was no need for the officers to retreat.

enter their respective properties. They argue that the habits of this country do not allow "uninvited visits" in the early morning hours, "absent some indication that the person accepts visitors at that hour or, where it is clearly observed that someone is awake in the home." We disagree.

Frederick's and Van Doorne's argument stems from Justice Alito's opinion in *Jardines*. In his dissent, Justice Alito opined that the implied license to enter one's property "has certain spatial and temporal limits."[65] As an example of these limits, Justice Alito stated:

> Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation. See *State v. Cada*, 129 Idaho 224, 233, 923 P. 2d 469, 478 (App. 1996) ("Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm[.]").[66]

The majority indicated some approval of this statement in a footnote, writing, "We think a typical person would find it a cause for great alarm (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule) to find a stranger snooping about his front porch *with or without* a dog."[67]

Based on Justice Scalia's reference to Justice Alito's comment, the time of a visit by police officers may be relevant when evaluating the constitutional validity of a knock-and-talk.[68] But we do not read *Jardines* as adopting any sort of bright-line rule that prohibits

---

[65] *Jardines*, 569 US at ___; 133 S Ct at 1422 (Alito, J., dissenting).

[66] *Id* at ___; 133 S Ct 1422.

[67] *Id.* at ___; 133 S Ct at 1416 n 3 (opinion of the Court) (quotation marks and citation omitted).

[68] See, e.g., *Kelley*, 347 P3d at 1014-1016. This, however, is not necessarily a new requirement found in *Jardines*. Several cases predat-

officers from entering an area protected by the Fourth
Amendment at certain times of day. Rather, the basis
for finding that the time of a visit is relevant to the
scope of the implied license was articulated by the
*Jardines* majority when it stated, "a typical person
would find it a cause for great alarm (*the kind of
reaction* the dissent quite rightly relies upon to justify
its no-night-visits rule) to find a stranger snooping
about his front porch *with or without* a dog."[69] Thus, it
is not simply the presence of an individual at a par-
ticular time, but rather, the reaction that a typical
person would have to that individual's presence, that
determines whether the scope of the implied license
has been exceeded. How a typical person would react
depends on more than the time of day. For example, the
implied license at issue here might not extend to a
midnight visitor looking through garbage bins[70] or
peeking in windows. But it may well extend to a
midnight visitor seeking emergency assistance,[71] or to
a predawn visitor delivering the newspaper. Similarly,
while a typical person may well find the presence of
uniformed police officers on his or her doorstep in the
early hours of the morning "unwelcome," we cannot
conclude that it is, without more, the type of circum-
stance that would lead an average person "to—well,
call the police."[72]

---

ing *Jardines* have discussed the relevance of the time a knock-and-talk
is conducted when evaluating the circumstances of a particular case.
See *id.* at 1015, 1015 n 14.

[69] *Jardines*, 569 US at ___; 133 S Ct at 1416 n 3 (quotation marks and
citation omitted; first emphasis added).

[70] See *Commonwealth v Ousley*, 393 SW3d 15 (Ky, 2013).

[71] See *id.* at 19, 31 ("Absent an emergency, such as the need to use a
phone to dial 911, no reasonable person would expect the public at his
door" at the time an officer searched the defendant's trash cans on
private property, 11:30 p.m. and 12:30 a.m.).

[72] *Jardines*, 569 US at ___; 133 S Ct at 1416.

The case relied on by Justice Alito when stating his "no-night-visits" rule provides an example of when officers conducting an early-morning visit to private property did exceed the scope of the implied license. In *Cada*:

> At about 1 a.m. on June 10, 1993, Agent Thornton returned to the Cada property with Agent Landers. The two walked from the county road up Cada's driveway. While on the driveway both agents smelled growing or freshly cultivated marijuana. The odor appeared to be coming from a garage located about 110 feet from the house. The agents continued on the driveway to an area between the garage and the house. They then set up a thermal imaging device and directed it at the garage. The device is a passive, non-intrusive system that detects the surface temperature of an object. The agents concluded that heat coming from the garage was consistent with the amount of heat which would be necessary to grow marijuana. The agents were on the property approximately ten to fifteen minutes during this entry.
>
> The agents returned to the Cada property on June 21, 1993, at approximately 4 a.m. One or both of them wore camouflage clothing. Landers again smelled marijuana coming from the garage. On this visit the agents heard a noise coming from the back of the garage that sounded like an exhaust fan. Agent Thornton testified that in his experience indoor marijuana cultivation operations often have an exhaust system. Thornton set up a motion-activated low light infrared video camera and two infrared sensors in a position hidden among bushes across the driveway from the garage. The camera was focused on the garage. This intrusion onto Cada's property lasted about 45 minutes.[73]

The agents then used the information gleaned from these nighttime intrusions to obtain a warrant.[74] In

---

[73] *Cada*, 129 Idaho at 227.

[74] *Id.*

concluding that this conduct exceeded the open-view doctrine, the court explained:

> Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm. As compared to open daytime approaches, surreptitious searches under cover of darkness create a greater risk of armed response— with potentially tragic results—from fearful residents who may mistake the police officers for criminal intruders.

> For the foregoing reasons, we conclude that the timing and manner of the two nighttime searches involved in this case place them outside the scope of the open view doctrine articulated in [State v ]Rigoulot[, 123 Idaho 267; 846 P2d 918 (1992),] and [State v ]Clark[, 124 Idaho 308; 859 P2d 344 (1993)]. In those cases, the breadth of permissible police activity was tied to that which would be expected of "ordinary visitors," Rigoulot, 123 Idaho at 272, 846 P.2d at 923, and "reasonably respectful citizens." Clark, 124 Idaho at 313, 859 P.2d at 349. The clandestine intrusion of Agents Thornton and Landers onto Cada's driveway under cover of darkness in the dead of night exceeded the scope of any implied invitation to ordinary visitors and was not conduct to be expected of a reasonably respectful citizen.[75]

Thus, in *Cada*, it was not simply that the officers entered the premises in the early hours of the morning that created the constitutional problem. Rather, it was that the officers used the "cover of darkness" to conduct a "clandestine intrusion" of the property that caused them to exceed "the scope of any implied invitation to ordinary visitors . . . ."[76] This type of "furtive intrusion late at night or in the predawn hours" is not the type of

[75] *Id.* at 233.

[76] *Id.*

"conduct that is expected from ordinary visitors[,]" and thus, could lead to "potentially tragic results . . . ."[77]

In nearly every relevant way, the conduct that occurred in this case is the exact opposite of what occurred in *Cada*. Officers did not furtively approach either home; the officers walked directly to the homes and knocked. There was nothing clandestine about their behavior. And rather than refuse to come to the door or call the police, both Frederick and Van Doorne answered the door and spoke with the officers. What occurred in the cases before us was not a " '[f]urtive intrusion late at night or in the predawn hours' " that " 'if observed by a resident of the premises . . . could be a cause for great alarm[.]' "[78] Thus, although the officers visited the homes in the early hours of the morning, that fact does not render the knock-and-talks unconstitutional under the circumstances of these cases.

### 3. "COMMUNITY STANDARDS"

Finally, Frederick and Van Doorne argue that the officers "failed to follow community standards" by "incessantly" pounding on each door until the officers received an answer. The record simply does not sup-

---

[77] *Id*. Other cases have similarly concluded that *clandestine* entries into areas protected by the Fourth Amendment are unconstitutional. See *State v Ross*, 141 Wash 2d 304; 4 P3d 130 (2000) (without attempting to contact a home's occupants, the police entered the property shortly after midnight in plain clothes to check for the odor of marijuana emanating from a garage); *State v Johnson*, 75 Wash App 692; 879 P2d 984 (1994) (the police entered private property via a state park shortly after 1:00 a.m., past signs that said "Private Property" and "No Trespassing," and then used a thermal imaging device to investigate a barn).

[78] *Jardines*, 569 US at ___; 133 S Ct at 1422 (Alito, J., dissenting), quoting *Cada*, 129 Idaho at 233.

port these factual assertions. As found by the trial court, the officers knocked on each door and waited a few minutes for someone to respond. This factual conclusion was supported by the testimony of several officers, all of whom testified to knocking on each door and waiting a matter of minutes for a response. Frederick's and Van Doorne's argument lacks merit.

Affirmed.

K. F. KELLY, J., concurred with TALBOT, C.J.

SERVITTO, J. (*dissenting*). I respectfully dissent.

On remand, our Supreme Court directed us to address "whether the 'knock and talk' procedure conducted in [these cases] is consistent with US Const, Am IV, as articulated in *Florida v Jardines*, [569 US ___;] 133 S Ct 1409[; 185 L Ed 2d 495] (2013)." *People v Frederick*, 497 Mich 993 (2015). *People v Van Doorne*, 497 Mich 993 (2015). The majority interprets this directive to mean that our inquiry is strictly limited to the question whether the knock-and-talk procedure used in these cases amounts to a "search" within the meaning of the Fourth Amendment, indicating its belief that the United States Supreme Court's inquiry in *Jardines* was firmly limited to the question whether the officers' behavior was a search within the meaning of the Fourth Amendment. I disagree that our Supreme Court's directive was so restrictive or narrow, or that the *Jardines* Court's inquiry was so limited.

In *Jardines*, the United States Supreme Court began by stating the basic principle that a search within the meaning of the Fourth Amendment occurs when the government obtains information by physically intruding on persons or houses. *Jardines*, 569 US at ___; 133 S Ct at 1414. According to *Jardines*:

> That principle renders this case a straightforward one.
> The officers were gathering information in an area belong-
> ing to Jardines and immediately surrounding his
> house—in the curtilage of the house, which we have held
> enjoys protection as part of the home itself. And they
> gathered that information by physically entering and
> occupying the area to engage in conduct not explicitly or
> implicitly permitted by the homeowner. [*Id.* at ___; 133 S
> Ct at 1414.]

The United States Supreme Court then went on,
however, to engage in a lengthy analysis of whether
Jardines had "given his leave" for the police and the
dog to be on his front porch. Thus, the case focused on
the scope of an implicit license and the objective
reasonableness of what the Court deemed to be an
obvious search, and not, as the majority asserts,
whether a search had occurred at all. This focus makes
sense because the Fourth Amendment protects against
unreasonable searches and seizures, not simply
searches and seizures. The *Jardines* Court stated that

> the question before the court is precisely *whether* the
> officer's conduct was an objectively reasonable search. As
> we have described, that depends upon whether the officers
> had an implied license to enter the porch, which in turn
> depends upon the purpose for which they entered. [*Id.* at
> ___; 133 S Ct at 1416-1417.]

According to the *Jardines* Court:

> A license may be implied from the habits of the country,
> notwithstanding the strict rule of the English common law
> as to entry upon a close. We have accordingly recognized
> that the knocker on the front door is treated as an
> invitation or license to attempt an entry, justifying ingress
> to the home by solicitors, hawkers and peddlers of all
> kinds. This implicit license typically permits the visitor to
> approach the home by the front path, knock promptly,
> wait briefly to be received, and then (absent invitation to
> linger longer) leave. Complying with the terms of that
> traditional invitation does not require fine-grained legal

knowledge; it is generally managed without incident by
the Nation's Girl Scouts and trick-or-treaters. *Thus, a
police officer not armed with a warrant may approach a
home and knock, precisely because that is no more than
any private citizen might do.* [*Id.* ___; 133 S Ct at 1415-
1416 (quotation marks and citations omitted; emphasis
added).]

The United States Supreme Court further stated that
the scope of the license was limited to a particular area
*and* to a specific purpose. *Id.* ___; 133 S Ct at 1416.
Thus, though it cannot be denied that the final holding
of *Jardines* was that a search occurred, the answer to
that question required an expansive inquiry into, and
analysis of, several factors, including the context of the
procedure employed and the reasonableness of the
officers' actions.

A knock-and-talk represents one tactic employed by
police officers that does not generally contravene the
Fourth Amendment. See, e.g., *People v Frohriep*, 247
Mich App 692, 698; 637 NW2d 562 (2001) ("We con-
clude that in the context of knock and talk the mere
fact that the officers initiated contact with a citizen
does not implicate constitutional protections."). The
*Frohriep* Court also recognized, however, that the
knock-and-talk procedure is not entirely without con-
stitutional implications. "Anytime the police initiate a
procedure, whether by search warrant or otherwise,
the particular circumstances are subject to judicial
review to ensure compliance with general constitu-
tional protections. Accordingly, what happens within
the context of a knock and talk contact and any
resulting search is certainly subject to judicial review."
*Id.* at 698.

The majority opinion in *Jardines* did not expressly
discuss any spatial or temporal limitations on the im-
plied license to approach a home. The dissent, however,
did. See *Jardines*, 569 US at ___; 133 S Ct at 1422-1423

(Alito, J., dissenting). Specifically, the dissent found that the implied license contained the following limitations: (1) "[a] visitor must stick to the path that is typically used to approach a front door, such as a paved walkway"; (2) a visitor may not "come to the front door in the middle of the night without an express invitation"; and (3) "a visitor may not linger at the front door for an extended period." *Id.* at ___; 133 S Ct at 1422. Though the majority opinion did not specifically impose any temporal limits, it favorably referred to the dissent's "no-night-visits rule" in a footnote. See *id.* at ___ n 3; 133 S Ct at 1416 n 3 (opinion of the Court). In that footnote, the majority indicated that a "typical person" would find the use of a drug-sniffing dog "a cause for great alarm," which, it stated, was "the kind of reaction the dissent quite rightly relie[d] upon to justify its no-night-visits rule[.]" *Id.* at ___ n 3; 133 S Ct at 1416 n 3. The majority also stated that the dissent presented "good questions" regarding the scope of the implied license, which included a consideration of "the appearance of things," "what is typical for a visitor," "what might cause alarm to a resident of the premises," "what is expected of ordinary visitors," and "what would be expected from a reasonably respectful citizen[.]" *Id.* at ___ n 2; 133 S Ct at 1415 n 2 (quotation marks omitted).

Recently, in *United States v Walker*, 799 F3d 1361 (CA 11, 2015), the United States Court of Appeals for the Eleventh Circuit determined that the scope of a knock-and-talk is limited in two respects. First, citing *Jardines*, 569 US at ___; 133 S Ct at 1416-1417, the court indicated that this exception to the warrant requirement "ceases where an officer's behavior 'objectively reveals a purpose to conduct a search.'" The second limitation is that "the exception is geographically limited to the front door or a 'minor departure' from it." *Walker*, 799 F3d at 1363.

Based on *Jardines* and our Supreme Court's directive, I would interpret the instant case as presenting the specific question of whether a knock-and-talk procedure conducted at a private residence in the middle of the night (the "predawn hours"), without evidence that the occupant of the residence extended an explicit or implicit invitation to strangers to visit during those hours, is an unconstitutional search in violation of the Fourth Amendment. Michigan courts have yet to address possible constitutional limitations on the knock-and-talk procedure. See *People v Gillam*, 479 Mich 253, 276 n 13; 734 NW2d 585 (2007) (KELLY, J., dissenting) ("This Court has not yet discussed the constitutionality of, or limits to, traditional knock-and-talk encounters."). Other jurisdictions have, however, addressed the limitations of an implicit license with respect to police officers' warrantless approach to homes.

In *Kelley v State*, 347 P3d 1012, 1013 (Alas App, 2015), two Alaska state troopers, acting on an anonymous tip, drove up a defendant's driveway shortly after midnight. The defendant's home was in a rural area and set back from the road a considerable distance. *Id*. The troopers remained in their car for several minutes and rolled down the windows, sniffing the air. *Id*. Detecting an odor of marijuana in the air, the troopers left and obtained a warrant to search the defendant's home, which revealed evidence of a marijuana grow operation. *Id*. The trial court denied the defendant's motion to suppress the evidence seized in the search, reasoning "that the driveway to [the defendant]'s house was impliedly open to public use because it provided public ingress to and egress from her property . . . ." *Id*. The Alaska Court of Appeals directed the parties to brief the recently decided case of *Jardines* with respect to the defendant's appeal of her conviction. *Id*.

The *Kelley* court recognized *Jardines*'s holding "that a police officer has an implicit license to approach a home without a warrant and knock on the front door because this is 'no more than any private citizen might do.' " *Id.* at 1014. It also pointed out, however, that in *Jardines*, the United States Supreme Court recognized that the scope of the "implicit license [wa]s limited not only to the normal paths of ingress and egress, but also by the manner of the visit." *Id.* The *Kelley* court quoted *Jardines*'s statement that " '[t]o find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police.' " *Id.*, quoting *Jardines*, 569 US at ___; 133 S Ct at 1416. The *Kelley* Court thus found that the *manner* of the visit was of paramount importance in the *Jardines* decision.

In *Kelley*, the court determined that the search there was *more* intrusive than was the search in *Jardines* because it took place after midnight. *Kelley*, 347 P3d at 1014. In making this determination, *Kelley* referred to Justice Alito's dissent in *Jardines* in which he indicated that a visitor could not come to a home in the middle of the night without express invitation. *Id.* The *Kelley* court further stated that the *Jardines* majority "referred approvingly to the dissent's 'no-night-visits rule.' " *Id.* at 1014-1015. Ultimately, the *Kelley* court found that the officers' conduct constituted an illegal search, that the warrant obtained was tainted by the illegal search, and that any evidence obtained under the warrant must be suppressed. *Id.* at 1016.

We recognize that the *Kelley* majority, in addressing the dissent's position, specifically stated that "the legal principles that govern a 'knock and talk' do not apply

here, because the State never asserted, and the record does not show, that the troopers approached Kelley's residence to engage in a knock and talk." *Id.* However, *Kelley* also pointed out that all the knock-and-talk cases relied on by the dissent considered the lateness of the hour as an important factor to consider "in assessing the overall coerciveness and lawfulness of a knock and talk." *Id.*

In *United States v Lundin*, 47 F Supp 3d 1003, 1007-1008 (ND Cal, 2014), after interviewing a kidnapping victim at a hospital in the early morning hours, a police officer contacted dispatch and requested a BOLO ("be on the lookout") for the kidnapper, Lundin. The officer also requested that Lundin be arrested on several charges. *Id.* at 1008. In response to the BOLO, another officer drove to Lundin's home, saw Lundin's car and light on inside the home, and called for backup. *Id.* At approximately 4:00 a.m. the officers knocked on Lundin's front door. *Id.* The officers heard loud crashing from the back of the home, and they ordered whoever was in the backyard to come out with hands up, at which point Lundin exited the backyard and was taken into custody. *Id.* Officers then searched Lundin's home and backyard, finding two firearms. *Id.* at 1009.

In determining the reasonableness of the search conducted at Lundin's home, the United States District Court for the Northern District of California pronounced that "it is 'a firmly-rooted notion in Fourth Amendment jurisprudence' that a resident's expectation of privacy is not violated, at least in many circumstances, when an officer intrudes briefly on a front porch to knock on a door in a non-coercive manner to ask questions of a resident." *Id.* at 1011. As in *Jardines*, the *Lundin* court noted that the rationale for this is that residents of a home typically extend an

implicit license to strangers to approach the home by the front path, to knock, to linger briefly to be received, and absent invitation to stay longer, to leave. *Id.* at 1011. In *Lundin*, two factors indicated that the officers' conduct exceeded the scope of the recognized implied license: (1) their purpose was to locate Lundin and to arrest him, not to talk to him, and (2) the approach took place at 4:00 a.m. *Id.*

In contemplating the purpose of the officers' visit, the *Lundin* court indicated that whether the officers' conduct constituted an objectively reasonable search depended on whether the officers had an implied license to approach Lundin's home, which depended, in part, on their purpose for doing so. *Id.* at 1012. The court did not hold that the officers' purpose was a dispositive factor in analyzing whether the officers' visit fell within the scope of a lawful knock-and-talk, but that it was at least a significant factor. *Id.* at 1013. The time of the visit, 4:00 a.m., was the other significant factor, it being "a time at which most residents do not extend an implied license for strangers to visit." *Id.* The *Lundin* court concluded that "[b]y entering onto Lundin's curtilage at four in the morning for the purpose of locating him to arrest him, the officers engaged not in a lawful 'knock and talk' but rather in a presumptively unreasonable search." *Id.* at 1014.

While not presented with a situation in which an officer attempted to contact the homeowner,[1] the Kentucky Supreme Court, to determine the reasonableness of such a visit, nonetheless found it necessary to address the time of day an officer visited a home. *Commonweath v Ousley*, 393 SW3d 15 (Ky, 2013). The

---

[1] An officer removed trash from the curtilage of a home in the late night/early morning hours in order to investigate tips that the homeowner was engaged in illegal drug sales from the home.

*Ousley* court stated, "Surely there is no reasonable basis for consent to ordinary public access, presumed or otherwise, for the public to enter one's property at midnight absent business with the homeowner. Girl Scouts, pollsters, mail carriers, door-to-door salesmen just do not knock on one's door at midnight . . . ." *Id.* at 30. The court also noted that the time limitation appears in several curtilage cases and that

> [o]ne of the earliest knock-and-talk cases laid out the rule like this:
>
>> Absent express orders from the person in possession against any possible trespass, there is no rule of private or public conduct which makes it illegal per se, or a condemned invasion of the person's right of privacy, for anyone openly and peaceably, *at high noon*, to walk up the steps and knock on the front door of any man's "castle" with the honest intent of asking questions of the occupant thereof—whether the questioner be a pollster, a salesman, or an officer of the law. *Davis v. United States*, 327 F.2d 301, 303 (9th Cir.1964), *impliedly overruled on other grounds as suggested in United States v. Perea-Rey*, 680 F.3d 1179, 1187 (9th Cir.2012) (emphasis added).
>
>> As *Davis* went on to note, "The time of day, coupled with the openness of the officers' approach to defendant's doorway, rules out the possible dangers to their persons which might have resulted from a similar unannounced call in the dead of night." *Id.* at 304. Numerous other cases mention time of the invasion as a factor in whether the Fourth Amendment is violated. [*Ousley*, 393 SW3d at 30-31.]

*Ousley* thus concluded that, "just as the police may invade the curtilage without a warrant only to the extent that the public may do so, they may also invade the curtilage only *when* the public may do so." *Id.* at 31.

In a pre-*Jardines* case involving observations made by the police from a defendant's driveway during 1:00 a.m. and 4:00 a.m. visits, an Idaho appellate court indicated that the time of day and openness of the officer's approach have been found to be significant factors in determining whether the scope of the implied invitation to enter areas of a private home's curtilage was exceeded. *State v Cada*, 129 Idaho 224; 923 P2d 469 (1996). "Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors." *Id.* at 233.

In sum, the time of a knock-and-talk visit, while perhaps not the *only* deciding factor in determining whether an unconstitutional (unreasonable) search occurred, is at least a *significant* factor among those to be considered along with the totality of the circumstances surrounding the knock-and-talk. In these consolidated cases, the totality of the circumstances leads me to conclude that both knock-and-talk occurrences constituted unconstitutional searches.

On the night of March 17, 2014, seven officers appeared for the knock-and-talks at defendants' (corrections officers with Kent County) homes. The officers arrived at each house in four unmarked vehicles. Each officer wore a tactical vest with a firearm on his or her hip, but the officers were not in full uniform. The officers went to Frederick's home at approximately 4:14 a.m., and then went to Van Doorne's home at approximately 5:30 a.m. Each defendant was asleep when the officers arrived, and the officers pounded on a door to each home before making contact with each defendant. The officers pounded on Frederick's front door, but had to knock on a door next to the garage at Van Doorne's because icy conditions prevented the officers from approaching Van Doorne's front door.

Considering the circumstances of these cases, it is very difficult to imagine why the officers tried to initiate consensual conversations with Frederick and Van Doorne between 4:00 a.m. and 5:30 a.m. to simply ask questions of each of them. Just as the behavior of the officers in *Jardines* "objectively reveals a purpose to conduct a search," *Jardines*, 569 US at ___; 133 S Ct at 1417, the behavior of the officers in this case objectively reveals a purpose to conduct a warrantless search of these defendants' homes to obtain evidence.

Significantly, at least two of the officers testified that they had enough probable cause to obtain search warrants for the homes but did not do so, instead electing to go to defendants' homes in the early morning hours as a matter of "courtesy" because defendants were officers employed by the same sheriff department. Van Doorne testified that one of the officers told him that they chose to not seek a warrant because the department did not want a public record of the situation at that time. The highest-ranking officer on the scene admitted that at some point, he told Van Doorne that the decision was made to not get a warrant because if a warrant was obtained, the media would get hold of it right away. The testimony supports the conclusion that the primary purpose of conducting the knock-and-talks was to obtain—without a warrant— the evidence that one officer had earlier delivered to defendants. The officers claimed they did not get a warrant because they wished to avoid publicity focused on the Kent County Sheriff's Department. Objectively, according to the testimony, the officers that appeared at defendants' homes in the early morning hours did not seek to ask defendants questions, but rather, they sought to search defendants' homes to obtain perishable evidence before it "disappeared," and to avoid publicity.

The time of day that the officers appeared at defendants' homes also lends support for finding that their conduct violated the Fourth Amendment. As previously indicated, the knock-and-talk exception to the warrant requirement is premised, at its most basic level, on the fact that the police are acting consistently with the implied license a homeowner extends to the public-at-large. *Jardines*, 569 US at ___; 133 S Ct at 1415. There is no evidence that either Frederick or Van Doorne extended an invitation to the public to come to their homes between the hours of 4:00 a.m. and 5:30 a.m. Absent evidence that Frederick or Van Doorne regularly expected or accepted visitors or public company at those hours, the officers cannot rely on the implied consent exception for the knock-and-talks they conducted at 4:00 a.m. and 5:30 a.m., because those are not times "at which most residents extend an implied license for strangers to visit." *Lundin*, 47 F Supp 3d at 1013. Moreover, several of the involved officers, including the lead officer, testified that they could have waited and spoken to defendants several hours later, during daylight hours.

Yet another factor worthy of consideration is the sheer number of officers who appeared at defendants' homes in the early morning hours. By all accounts, seven officers came to defendants' homes, armed and wearing their tactical gear, to, according to the officers, conduct knock-and-talks. It is difficult to conceive of a reason why it would be necessary for seven officers to come to the home of another officer at 4:00 a.m. or 5:30 a.m. to simply ask questions.

I reach my conclusion that the officers' conduct violated the Fourth Amendment on the basis of *all* of the circumstances of this case, including the time of night, an objective view of the officers' conduct, and the

officers' failure to advance any objectively reasonable explanation for why they could not gather their evidence during the day, or proceed with obtaining a warrant. As a result, I would reverse the trial court's order in each case and remand to the trial court for entry of an order granting defendants' motions to suppress the evidence. I reach this conclusion despite the fact that after the officers spoke to defendants, defendants consented to searches of their homes.

"A search preceded by a Fourth Amendment violation remains valid if the consent to search was voluntary in fact under the totality of the circumstances." *United States v Fernandez*, 18 F3d 874, 881 (CA 10, 1994).

> When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged. To satisfy this burden, the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal [action] and the consent. No single fact is dispositive, but the so-called "Brown factors" (from *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)) are especially important: (1) the temporal proximity of the illegal [action] and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct. [*United States v Reyes-Montes*, 233 F Supp 2d 1326, 1331 (D Kan, 2002) (quotation marks and citations omitted; alterations in original).]

In these consolidated cases, as in *Reyes-Montes*, 233 F Supp 2d at 1331, I cannot conclude that there was a sufficient attenuation between the unlawful entries and the defendants' consents. The consent of each defendant came within a few minutes of the officers' entries. *Id.* There were no intervening circumstances present to "break the causal connection" or eliminate

the coercive effects of the unlawful entry. *Id.* With regard to the purpose and flagrancy of the misconduct, "the officers' conduct here may have been well-intentioned, but . . . a warrantless entry into a house is presumptively unreasonable, and the physical entry of the house is the chief evil against which the Fourth Amendment is directed." *Id.* The defendants' purported consent to search directly flowed from the officers' unlawful entry, and thus I cannot find that the searches were permissible under the Fourth Amendment.

Even if the knock-and-talks were viewed as permissible, "[a] knock and talk becomes a seizure requiring reasonable suspicion where a law enforcement officer, 'through coercion, "physical force[,] or a show of authority, in some way restricts the liberty of a person." ' " *United States v Crapser*, 472 F3d 1141, 1150 (CA 9, 2007) (Reinhardt, J., dissenting) (citation and emphasis omitted; alteration in original); see *United States v Chan-Jiminez*, 125 F3d 1324, 1326 (CA 9, 1997). "[F]actors, such as a display of weapons, physical intimidation or threats by the police, multiple police officers questioning the individual, or an unusual place or time for questioning may transform a consensual encounter between a citizen and a police officer into a seizure." *United States v Ponce Munoz*, 150 F Supp 2d 1125, 1133 (D Kan, 2001).

Again, in these cases, seven officers appeared in the very early morning hours at the fellow officers' homes, purportedly to ask them questions. The officers who approached the door, at least two of whom were higher in rank than defendants, knocked for several minutes, aware that no one was awake in the homes. While neither Frederick nor Van Doorne felt "threatened" by the officers, both were in a unique situation—both defendants were employed by the same department as

the officers at their homes. Understandably, Frederick and Van Doorne testified that because members of their own department were at their doors asking to talk to them about an investigation, they felt that they were not free to say no, and that they would be risking their employment if they failed to comply with a departmental request. Seven officers appearing at the home of a fellow officer in the wee hours of the morning, armed and in tactical gear, advising each defendant that his name had come up in a criminal investigation, could be viewed as a show of authority designed to assure that the defendants would not deny their "request" to enter each defendant's home to talk, and/or for permission to search the defendants' homes. "The ordinary remedy in a criminal case for violation of the Fourth Amendment is the suppression of any evidence obtained during the illegal police conduct," *United States v Perez-Partida*, 773 F Supp 2d 1054, 1059 (D NM, 2011), and I would find it to be the appropriate remedy in these cases.